**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

      v.                                            No. 08-M-51

DIANE FERRETTI,
                Defendant.

---

**APPEARANCES:**                          **OF COUNSEL:**

HON. ANDREW T. BAXTER               EDWARD P. GROGAN, ESQ.
United States Attorney for the          Assistant United States Attorney
  Northern District of New York
Attorney for United States
Room 231
James T. Foley U.S. Courthouse
Albany, New York 12207-2924

HON. ALEXANDER BUNIN                TIMOTHY E. AUSTIN, ESQ.
Federal Public Defender for the         Assistant Federal Public Defender
  Northern District of New York
Attorney for Defendant
39 North Pearl Street
Fifth Floor
Albany, New York 12207

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**

On February 15, 2008, defendant Diane Ferretti ("Ferretti") was arrested pursuant to a complaint alleging that on November 19, 2007, Ferretti threatened to harm Hillary Clinton[1] in violation of 18 U.S.C. § 879.  Compl. (Docket No. 1); Docket entry dated 2/15/08.  On February 20, 2008, Ferretti's counsel moved for a competency examination,

---

[1] As the wife of former President William J. Clinton and herself then a major candidate for President, Ms. Clinton was under the protection of the United States Secret Service pursuant to 18 U.S.C. § 3056(a)(6).

the motion was granted, and on June 16, 2008, Ferretti was found incompetent to stand trial by reason of mental disease or defect. Docket Nos. 3, 6, 10. In accordance with 18 U.S.C. § 4241(d)(1), a hearing was directed to be held within four months to determine whether a substantial probability existed that Ferretti would become competent to stand trial. Docket No. 10.

In anticipation of the rehearing, a report was submitted by a Federal Bureau of Prisons ("BOP") psychologist concluding that Ferretti continued to be incompetent to stand trial and would remain so absent the administration of medication which Ferretti was refusing. Ex. G-1[2] (Forensic Evaluation dated Dec. 20, 2008) at 6; Docket No. 22-4 (same) at 6. The United States then moved for an order authorizing the involuntary medication of Ferretti to restore her to competence and Ferretti opposed the motion. Docket Nos. 16, 22. An evidentiary hearing was held on June 17, 2009[3] at which testimony was presented by four witnesses.[4] For the reasons set forth herein, it is recommended that the government's motion for an order authorizing the involuntary medication of Ferretti be denied.

---

[2]"Ex. G" or "Ex. D" followed by a number refers to the exhibits received in evidence during the evidentiary hearing on June 17, 2009.

[3]The hearing was conducted by video and by telephone. Present in Albany were the Court, the attorneys, one witness, and the court reporter. Present at a video location at the Carswell Federal Medical Center, Ft. Worth, Texas ("Carswell") were Ferretti and two witnesses. Present by telephone from St. Louis, Missouri was an additional witness.

[4]In order of testimony, the witnesses were Dr. Leslie J. Powers, a psychologist at Carswell; Dr. Camille Kempke, a psychiatrist at Carswell; Special Agent James Cook, United States Secret Service; and Dr. C. Robert Cloninger, a psychiatrist at the Washington University Medical School in St. Louis.

## I. Background

Ferretti, now thirty-eight, has been observed, examined, evaluated, and treated at Carswell since her arrival there on August 27, 2008. Docket entry (Court only) dated 9/15/08. Ferretti is single and has no children. Ex. G-1 at 2. She completed high school and one semester of college and served in the Army for nine months. Id. She has a minimal work history and for the ten years prior to her arrest, had supported herself financially principally from an inheritance. Id.

There exists no dispute over Ferretti's present competence. Ferretti has continuously exhibited a rigid belief that she is being persecuted by the United States government, including filing the false charge in this case by the Secret Service. Ex. G-1 at 3-5. This belief primarily led to the diagnosis of Delusional Disorder, Persecutory Type. Id. at 5. Ferretti also holds the belief that she is being persecuted by the government because of her intelligence and expansive knowledge of the United States military. Id. This led evaluators to add Grandiose Type to her diagnosis. Id.[5] Based on this diagnosis, evaluators have concluded that Ferretti "suffers from a severe mental disease which renders her unable to understand the nature and consequences of the proceedings against her and to assist properly in her defense . . . ." Ex. G-1 at 6.[6]

---

[5] Dr. Kempke, Ferretti's treating psychiatrist at Carswell, concurred with this diagnosis at the time of the report in December 2008. At the hearing, she testified that she has now concluded that the more appropriate diagnosis is not Delusional Disorder but Paranoid Schizophrenia. T. 84-86. According to Dr. Kempke, however, the assessment of Ferretti's competence, prognosis, and treatment remain the same for either diagnosis. T. 87. Dr. Cloninger, Ferretti's retained, non-treating psychiatrist, agreed with the diagnosis of Delusional Disorder. T. 159.

[6] The government does not contend that Ferretti poses a danger to herself or others. According to Dr. Powers, Ferretti poses no threat to herself, other inmates, or the staff at

There exists substantial dispute over the appropriate treatment for restoring Ferretti to competence. Those at Carswell agree that anti-psychotic medication affords the best option for treatment. Ex. G-1 at 6. Ferretti, however, has refused all medication. Id. The Carswell doctors believe that verbal therapy is unavailable as an option because it has been tried to date without success. They advise that because of her delusion of persecution by the government, Ferretti harbors such strong suspicions of the motives of all the personnel at Carswell, all government employees, that no one at Carswell can establish the trusting relationship with Ferretti essential to verbal therapy. T. 14-15. According to Dr. Cloninger, Ferretti's retained expert psychiatrist, verbal therapy remains an option for treatment. However, given Ferretti's principal delusion of persecution by the government, the therapy must be provided by someone unassociated with the government to allow development of trust with Ferretti. T. 172-77.

## II. Discussion

All persons possess a "liberty interest in avoiding the unwanted administration of anti-psychotic drugs under the Due Process Clause . . . ." Washington v. Harper, 494 U.S. 210, 221-22 (1990). However, the Supreme Court has carved a narrow exception to this rule which allows

> an incompetent defendant [to] be involuntarily medicated for the
> sole purpose of rendering him [or her] competent to stand trial
> only if . . . : (1) there are important government interests in trying
> the individual; (2) the treatment will significantly further those
> interests; (3) the treatment is necessary to further those

---

Carswell. Ex. G-1 at 5-6. Dr. Kempke testified that Ferretti poses no danger to herself or others and that Ferretti is not subject to civil commitment. T. 71.

4

>        interests, considering any less intrusive alternatives; and (4) the
>        treatment is medically appropriate.

United States v. Magassouba, 544 F.3d 387, 396 (2d Cir. 2008) (citing Sell v. United States, 539 U.S. 166, 180-82 (2003)).  In analyzing these factors, the "relevant findings must be supported by clear and convincing evidence." United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004).  The first factor presents a question of law.  Id.  The remaining three present primarily questions of fact.  Id.

### 1. Government Interests

Sell recognized that there exists "an important government interest in ensuring that individuals accused of serious crimes are brought to trial." United States v. Palmer, 507 F.3d 300, 303 (5th Cir. 2007) (citing Sell, 539 U.S. at 180).  In assessing the first factor, a court "must consider the facts of the individual case in evaluating the Government's interest in prosecution." Sell, 539 U.S. at 180.  Factors to be considered may include the statutory maximum sentence for the offense charges, indicating Congress' assessment of the seriousness of the charge, see United States v. Evans, 404 F.3d 227, 237 (4th Cir. 2005); Gomes, 387 F.3d at 160; the likelihood of extended civil commitment following criminal prosecution, see Gomes, 387 F.3d at 160 (citing Sell, 539 U.S. at 180); and the sentencing range under the Sentencing Guidelines in comparison to the length of time the defendant has been detained, see United States v. Hernandez-Vasquez, 513 F.3d 908, 919 (9th Cir. 2008) ("[T]he likely guideline range is the appropriate starting point for the analysis of a crime's seriousness.") (gathering cases and disagreeing with the Fourth Circuit's holding to the contrary in Evans, 404 F.3d at 237).

Ferretti is charged with a violation of 18 U.S.C. § 879. The maximum penalty upon conviction is five years imprisonment. 18 U.S.C. § 879(a). Threatening the life of federally protected individual is, by definition, a serious offense and is punishable as a felony rather than a misdemeanor. See Evans, 404 U.S. at 238 (finding a serious offense where the defendant was charged with assaulting a government employee and threatening to murder a federal judge); United States v. Orlofsky, 554 F. Supp. 2d 4, 5 (D. D.C. 2008) (finding a serious offense where the defendant was charged with threatening to use chemical weapons in violation of 18 U.S.C. § 1038 which carries a five-year maximum sentence). The five-year maximum sentence here, however, is at the lower end of felony offenses. Compare United States v. Green, 532 F.3d 538, 549 (6th Cir. 2008) (finding a serious offense where the defendant faced a ten-year mandatory minimum term of imprisonment); Palmer, 507 F.3d at 303-04 (finding that the charge of possessing a firearm and ammunition by an individual adjudicated mentally defective and carrying a maximum sentence of ten years imprisonment constituted a serious offense.).

The Sentencing Guideline range for Ferretti here, although now non-binding, is determined under U.S.S.G. § 2A6.1, which provides a base offense level of 12. A two-level enhancement is possible if the government demonstrates that Ferretti made more than two threatening statements. See U.S.S.G. § 2A6.1(b)(2).[7] This yields a minimum offense level of 12 and a maximum of 14. If Ferretti received credit for acceptance of responsibility, her offense level would be reduced by two levels. See U.S.S.G. § 3E1.1. It appears from the present record that Ferretti has no prior criminal history which would

---

[7] No such allegation is contained in the complaint, see Docket No. 1, nor has any evidence of more than two threats yet been proffered.

elevate her beyond Criminal History Category I.  Thus, on this record, if convicted, Ferretti would fall at a minimum in Level 10 and at most in Level 14.  In Criminal History Category I, then, her minimum guideline range at Level 10 would be six months imprisonment and her maximum at Level 14 would be twenty-one months imprisonment.  See U.S.S.G. Sentencing Table.

Ferretti has been incarcerated since her arrest on February 15, 2008, a period of nearly seventeen months to date.  Thus, it appears probable that Ferretti has now been incarcerated for a period longer than any likely sentence and approaching the maximum sentence she would likely receive.  See Sell, 529 U.S. at 180 (noting that the government interest may be undermined by "the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed) . . . .").

As the Sell Court noted, a special circumstance may exist where a defendant may face a lengthy period of civil confinement.  Sell, 539 U.S. at 180.  In that circumstance, civil confinement "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime."  Id.  Given the testimony of Drs. Powers and Kempke that Ferretti is not civilly committable, no such extended period of civil confinement appears likely for Ferretti if she remains incompetent to stand trial and it appears likely that she would soon be released to the community.  See Ex. G-2 at 5-6; T. 71. While the presence of this special circumstance may weigh against the government, the absence of this factor does not necessarily weigh in its favor.  Rather, where, as here, the absence of this circumstance rests on the uncontroverted testimony of the government's own medical experts that Ferretti does not pose a danger to herself or

others, the government interest in prosecuting her to protect those she threatened and others in the community is diminished.

Thus, the offense charged here constitutes a serious crime on its face. However, other factors present in this case undermine the government's interest in the prosecution of Ferretti here. First, the gravity of that offense falls at the lower end of serious offenses in the circumstances presented here. Second, Ferretti has already been incarcerated on this charge either for a longer period than any sentence she is likely to receive or approaching the maximum sentence she would likely receive. Finally, the record stands uncontradicted that Ferretti would not pose a threat to herself or others if released from custody. On this record, therefore, the government has failed to demonstrate by clear and convincing evidence that it possesses a sufficient interest in bringing Ferretti to trial as would support its motion here.

### 2. Treatment Will Significantly Further an Important Government Interest

The second factor requires the government to show "that involuntary medication will *significantly further* [its] . . . interests [in prosecution]." Sell, 539 U.S. at 181 (emphasis in original). This is demonstrated by showing that involuntary medication "is: substantially likely to render [Ferretti] competent to stand trial and substantially unlikely to have side effects that will interfere significantly with h[er] ability to assist in h[er] defense." Gomes, 387 F.3d at 161 (citing Sell, 539 U.S. at 181).

Generally, involuntary treatments with a 70% probability that competence will be restored suffice to establish a substantial likelihood of success while probabilities less than 50% will not. See Gomes, 387 F.3d at 161-62 (ordering involuntary medication where

8

both experts agreed that there was a 70% probability of restoring competence); United States v. Ghane, 392 F.3d 317, 320 (8th Cir. 2004) (holding that "[a] five to ten percent chance of restored competence cannot be considered substantially likely under any circumstances" and, represent at best only "a glimmer of hope") (internal quotation marks and citations omitted).

Here, the government's psychiatrist, Dr. Kempke, assesses the probability that involuntary medication would restore Ferretti to competence at 60-70%. T. 87, 131. The basis for that assessment is unclear. See T. 131-33. However, it comports with a study of federal inmates with delusional disorders who were involuntarily treated with anti-psychotic medication. See Ex. G-7. This study, known informally as the Herbel & Stelmach study, "was a retrospective analysis of 22 case files of [federal] inmates who had been diagnosed with delusional disorder from 1990 through 2003. The study concluded that over three-fourths (17) of these inmates had been restored to competency status after involuntary treatment with anti-psychotic medication . . ." United States v. Rix, 574 F. Supp. 2d 726, 734 (S.D. Tex. 2008). The reliability of the study is limited by several factors noted in the study itself, including

> (1) the lack of standardized clinical assessments [which] may have resulted in mis-diagnosis of some patients who were thus wrongly included or excluded from the study population; (2) standard methods to reduce bias (such as a placebo control group) [which] were not possible in a retrospective study, so the opinions of the forensic examiners may have been biased towards a favorable outcome; (3) the sample size is small; [and] (4) judicial records were not used to verify competency status in the putatively successful cases.

Id. at 734-35 (citations omitted).

Government experts in other involuntary medication proceedings have relied on the

9

Herbel & Stelmach study with mixed results.  For example, in Gomes, the Second Circuit accepted the unchallenged opinions of the experts that there existed a 70% probability of success for inmates involuntarily treated with anti-psychotic medication and this assessment sufficed to establish the second Sell factor.  387 F.3d at 161-62. However, in other cases where defendants challenged the Herbel & Stelmach study, different results obtained.  For example, in Rix, the court denied a motion for involuntary medication finding unreliable the scientific evidence presented in the Herbel & Stelmach study and in light of the inmate's long history of delusional disorder.[8]  574 F. Supp. 2d at 733-36.  In United States v. Reynolds, the court denied a motion for involuntary medication based on the defendant's long history of delusional disorder which indicated only a "dismal rate of one-in-four" restorations to competence.  553 F. Supp. 2d 788, 796-97 (S.D. Tex. 2008).  In United States v. Lindauer, the court denied involuntary medication due, inter alia, to "the gaps in the medical literature, . . . the unreliability of anecdotal evidence and . . . [the] absence of controlled studies . . . ."  448 F. Supp. 2d 558, 572 (S.D.N.Y. 2006).

   In these cases, as here, the government relied on the Herbel & Stelmach study as scientific support for its assessment of the probability of the success of involuntary medication for patients like Ferretti with delusional disorder.   As argued by Ferretti here, these cases point out the deficiencies in the Herbel & Stelmach study and the limitations in its reliability.  In addition to those limitations cited in the report itself, these include (1)

---

   [8]The longer an individual has suffered from delusions, the less likely that anti-psychotic medication will restore the individual to competence.  See Reynolds, 553 F. Supp. 2d at 797 (noting that in the Herbel & Stelmach study, patients who had suffered delusional disorders for ten years or less regained competence at a rate of 75% but those who had suffered for more than ten years regained competence at the rate of only 25%).  .

the fact that the authors were "employees of the [BOP] who were frequently called to testify on behalf of the government in Sell proceedings, and (2) the report's conclusion that "[a]dditional research is needed to confirm and expand on these findings." Rix, 574 F. Supp. 2d at 735 (citations omitted); see also Ghane, 392 F.3d at 319-20 (reversing the district court's order authorizing involuntary medication based on the testimony of at least four psychiatrists that 10% of individuals with delusional disorders who receive anti-psychotic medication experience a lessening of symptoms and only half became symptom-free). While the Herbel & Stelmach study provides some evidence of the probability of success, it falls short on its own of providing clear and convincing evidence of the success rate. In the absence of other evidence, the government has failed to meet its burden on this factor as well.[9]

**3. Necessity of Medication to Further Important Government Interest**

In determining whether involuntary medication is necessary, the government must show that there are no "alternative, less intrusive treatment[s] . . . []likely to achieve substantially the same results." Sell, 539 U.S. at 181. Such alternative means of treatment include verbal therapy and less intrusive means of medicating defendants such as administration and compliant consumption of medication pursuant to a court order. Gomes, 387 F.3d at 162-63 (citing Sell, 539 U.S. at 181). Ferretti has consistently refused

---

[9]As to the second aspect of this factor, there appears no persuasive evidence to contradict the government's proof that it is substantially unlikely that involuntary medication would have side effects which would interfere significantly with Ferretti's ability to assist in her defense. See also subsection 4 infra. Accordingly, on this record, the government has satisfied its burden of proof on this issue.

11

to take any medication voluntarily, even if ordered by a court. Therefore, the only available options for treatment are involuntary medication or verbal therapy.

Dr. Powers testified that various forms of verbal therapy have been attempted since Ferretti's arrival at Carswell. All have failed. The failure is attributed in principal part to the absence of any trusting relationship between Ferretti and any therapist or counselor. This in turn owes to Ferretti's central delusion that she is being persecuted by the government which employs the therapists and counselors. See Rix, 574 F. Supp. 2d at 736 (describing expert testimony that when treating patients with delusional disorders, a therapeutic relationship of trust is essential and that "forced medication would not help and would likely worsen the situation because when you attempt to treat the individual against their will . . . , very often the individual will then incorporate you into their delusion, because you are now part of the persecutory structure that has been trying to hurt them . . . ."). Given Ferretti's delusion of persecution and this history of failed verbal therapy at Carswell, the government views involuntary medication as the only available means to restore Ferretti to competence. Ex. G-1 at 5-6.

According to Dr. Cloninger, verbal therapy has been successful in treating patients with a delusion of government persecution when that therapy is provided by one not associated with the government. T. 172-77,[10] The absence of a government connection would allow a relationship of trust to develop with Ferretti which is essential to any verbal therapy. Id. Such treatment would presumably require the retention of a treating source from the private sector and the provision of treatment outside any prison in circumstances

---

[10] Dr. Cloninger cites as one instance his treatment of Dr. Sell, the defendant in the Supreme Court case on this issue. T. 176-77.

12

corroborating the absence of any connection between the government and the treating source.

The evaluation of this factor requires consideration of the degree of intrusiveness of any forced medication. According to Dr. Kempke, Ferretti would be placed in a secure cell on a secure cell block. A five-member team of corrections officers suited in protective vests, boots, goggles, and helmets would then enter her cell and restrain her by holding her head, arms, and legs. The skin at the injection site, either her arm or hip, would then be exposed for a nurse to clean the site and administer the injection with a needle. Ferretti would then be released from restraint and eventually returned to her own cell. T. 134-35. This procedure would be repeated approximately two days later and then again four weeks later. T. 136-37. The need for further injections in the same manner would depend on Ferretti's progress toward competence. Id.[11]

There is no dispute that verbal therapy for Ferretti at Carswell will be unavailing and that involuntary medication would be invasive. The question presented here, then, is whether verbal therapy by a non-government treating source must be attempted in these circumstances before involuntary medication is authorized. Such treatment may pose administrative and logistical difficulties as well as financial costs. However, the government has offered no evidence or argument that such difficulties or costs are prohibitive or should even be considered here. Dr. Cloninger has credibly testified that such non-government treatment may restore Ferretti to competence sufficient for her to stand trial, although that result is far from certain. Given these considerations and on this

---

[11] The possibility exists that, given Ferretti's delusion of government persecution, this procedure would exacerbate rather than alleviate that delusion. T. 172.

record, the government has failed to offer clear and convincing evidence that involuntary medication is necessary to further the government's interests where no attempt at non-government verbal therapy has been attempted.

### 4. Medical Appropriateness of Forced Medication

Finally, the government must show that involuntary medication is in the defendant's best interests given his or her current medical condition. Sell, 539 U.S. at 181. The evaluation focuses on the "different side effects and . . . different levels of success" of the various anti-psychotic treatments. Id. As the government points out, the treatment of delusional disorders with anti-psychotic medication has long been an accepted and appropriate course of treatment for the disease. See, e.g., Gomes, 387 F.3d at 163. Ferretti, however, offers two arguments against its appropriateness here.

First, Ferretti contends that the potential side effects of the anti-psychotic medications constitute unacceptable risks to her health. Those medications carry the potential for significant side effects, including death. See, e.g., T. 76-81. While the risks exist and while Ferretti conjures a specter of extreme adverse consequences, the medically supervised and responsible administration of the medication reduces any such risks. Given the substantial rewards of medication including restoration to competence, those rewards substantially outweigh the risks reasonably posed by potential side effects.

Second, Ferretti contends that involuntary medication in the circumstances of this case will violate her Fifth Amendment right to due process. Ferretti argues that at trial,

> the defense may involve Ms. Ferretti's mental state and beliefs concerning various conspiracies, including a government conspiracy, against her. It may be clear from her actions and

14

> subsequent conduct that Ms. Ferretti passionately believes in these conspiracies and that belief may have motivated her conduct in many important respects. A jury's assessment of her mental state could be the most important factor in its determination of the outcome of a trial. Thus, Ms. Ferretti has a due process right to show the jury her true mental state. . . . To the extent that her mental state would be significantly changed with mind altering drugs, Ms. Ferretti would be precluded from presenting evidence central to her defense.

Def. Mem. of Law (Docket No. 22) at 12-13. This contention assumes the admissibility of Ferretti's testimony at trial to demonstrate her then-existing mental state and beliefs from which a jury would be asked to infer her mental state and beliefs at the time of the alleged threats two or more years earlier.

However, if Ferretti remained incompetent to stand trial, she likely would be incompetent to offer substantive testimony at trial. Thus, the only relevance of her testimony would be as a demonstrative aid to illustrate her state of mind and beliefs. The admissibility of such testimony is at least questionable. Moreover, her state of mind and beliefs at the time of trial would likely be irrelevant to show that state of mind and beliefs two or more years earlier at the time of the alleged threats. Finally, other, more competent evidence of her state of mind and beliefs at the time in question would be available through the testimony of those who heard her declarations. It appears those witnesses are numerous. Accordingly, the involuntary medication of Ferretti would not deprive her of her rights to due process or a fair trial in these circumstances.

Therefore, the government has met its burden of demonstrating by clear and convincing evidence that the involuntary medication of Ferretti is medically appropriate.

### III. Conclusion

For the reasons set forth above, the government has failed to meet its burden of proof by clear and convincing evidence as to three of the four Sell factors.  Therefore, it is **RECOMMENDED** that the government's motion for an order authorizing the involuntary medication of Ferretti to restore her to competence (Docket No. 16) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).

Date: July 6, 2009  
Albany, New York

_David R. Homer_  
David R. Homer  
U.S. Magistrate Judge